SINGER MANUF'G CO. (WILSON v.). See Case No. 17,836.

SINGLETON (UNITED STATES v.). See Case No. 16,293.

---

## Case No. 12,905.

### SINGSTROM et al. v. The HAZARD.

[2 Pet. Adm. 384.] [1]

District Court, D. Pennsylvania. 1807. [2]

SEAMEN—WAGES—CAPTURE—RELEASE.

The mariners were taken from on board the Hazard by a French privateer, and the vessel sent into Cumana, and afterwards liberated. The seamen escaped from the privateer, and returned to the port of Philadelphia, some of them earning wages, others working their passages home. The Hazard performed her voyage, and returned to Philadelphia. The district court decreed wages to the seamen for the voyage, deducting whatever they had earned, after their separation from the Hazard.

"The libel of Erick Singstrom, Francis Summers, Cato Lewis and James Dyer humbly showeth, that your libellants shipped on board the schooner Hazard, N. D. Gardner, master, on the thirteenth day of April, in the year one thousand eight hundred and six, to perform a voyage from the port of Philadelphia to the island of St. Jago de Cuba in the West Indies, at the monthly wages of twenty-two dollars. That while they were proceeding on their said voyage, to wit, on the eighth day of May in the year aforesaid, the said schooner was captured by a French privateer, called the Superb, and your libellants were made prisoners, and taken on board the said privateer. That they remained on board the said privateer a considerable time, and unt 1 an opportunity offered of effecting their escape therefrom. That your libellants Francis Summers, and James Dyer, after incurring many hardships got a passage to New York on board the brig Thetis. That your libellant got on board the sloop Hannah, bound to New York, to which place he worked his passage. That your libellant Erick Singstrom was kept on board the said privateer until she went to the port of Cumana, where he found the said schooner Hazard, she having been liberated by the French, after being carried into Cumana. That as soon as he the said Erick found the said schooner in the said port of Cumana, he made his escape from the said privateer, and went on board the said schooner Hazard, and returned therein to the port of Philadelphia. That your libellants lost all their clothes, and received no wages whatever, except your libellant Erick Singstrom received four doubloons from the captain of the said privateer for repairing his mast, there being no person on board capable of doing it. That your libellants were forced from on board

the said schooner by a superior power, and greatly contrary to their will; and they are therefore entitled, by the maritime law and the customs and usages of nations to their wages, as if they had been actually on board the said schooner. That the said schooner arrived at the port of Philadelphia after performing her destined voyage, on the thirteenth day of November in the year aforesaid. That there are due to your libellants Francis Summers, Cato Lewis and James Dyer respectively, the sums of one hundred and thirty-two dollars; and your libellant Erick Singstrom, deducting the four doubloons, (or sixty-four dollars) the sum of sixty-eight dollars. That the said schooner is now lying in the port of Philadelphia, and within the jurisdiction of this honourable court. Wherefore, your libellants pray, that she may be attached, condemned and sold, together with her tackle, apparel and furniture, for the payment of the aforesaid wages, according to the laws of the United States, and the usages and customs of maritime courts; and they will ever pray, &c.

"Jno. L. Leib,
"Proctor for the Libellants."

Answer:
"The answer of Callender and Shipley, owners of the schooner Hazard, to the bill and libel filed of Erick Singstrom, Francis Summers, Cato Lewis and James Dyer who have attached the said schooner by process from this court.

"Your respondents reserving to themselves now and at all times hereafter, all manner of advantage and benefit of exceptions that may be had and taken to the many untruths, uncertainties, insufficiencies and imperfections in the said complainants' libel, for a full and perfect answer thereto, or to such parts thereof, as it materially concerns the respondents to make answer, they answer and say, That true it is the libellants shipped as stated in the libel, on board the schooner Hazard, on the thirteenth day of April, one thousand eight hundred and six, at the rate of twenty-two dollars per month, to perform a voyage from the port of Philadelphia to the island of St. Jago de Cuba, in the West Indies, and home. That while they were proceeding on the voyage aforesaid, to wit, on the eighth day of May in the year aforesaid, the schooner aforesaid with the libellants were captured by a French privateer, called the Superb, and the libellants were carried as prisoners in the first instance, on board the privateer aforesaid, and continued on board during a cruize the privateer made, on which cruize the privateer captured and made a prize. That the libellants severally did duty on board the privateer aforesaid, more especially and particularly Erick Singstrom, who remained on board the aforesaid privateer until she arrived at Barracoa, in Cuba, at which place the schooner aforesaid, owned by your respondents, was then lying under the com-

---

[1] [Reported by Richard Peters, Jr., Esq.]

[2] [Affirmed by circuit court; case unreported.]

mand of N. D. Gardner, when and where the aforesaid Erick Singstrom returned to the schooner aforesaid, and solicited and requested of the said captain N. D. Gardner, the commander of the said schooner, to carry him the said Erick as a passenger to work his passage back to Philadelphia, on board the said schooner, to which proposition the said captain N. D. Gardner agreed, and brought back the said Erick in the capacity aforesaid. The respondents give the honourable court to understand and be informed, that the said Erick Singstrom, one of the libellants, acknowledged the captain of the privateer aforesaid had given him several doubloons, to wit, the number of four, (or sixty-four dollars,) for work, labour and service done as a ship carpenter, in fishing or mending a mast that had been shattered or splintered in an engagement. And that he the said Erick had actually received two shares of prize-money from the proceeds of the capture made by the Superb, during the time the said Erick, one of the libellants, had been on board the privateer aforesaid called the Superb. The said Erick, one of the libellants, further acknowledged and declared, that the commander of the privateer aforesaid called the Superb, offered him the said Erick one of the libellants aforesaid, three shares of prize-money of such vessels as they should capture, if he would again go on board the privateer aforesaid upon another cruize, but the said Erick the libellant aforesaid refused. Your respondents also inform the honourable court that the other libellants, to wit, Francis Summers, Cato Lewis and James Dyer received and divided a share of prize-money of the prize or prizes so captured by the privateer Superb aforesaid. All which matters and things these respondents are ready to aver, maintain and prove to this honourable court.

"Your respondents therefore pray the honourable court that the said schooner Hazard, her tackle apparel and furniture may be discharged with reasonable costs and charges in this behalf by these respondents wrongfully sustained.                      Samson Levy,
          "Proctor for the Respondents."

Replication:

"And the said libellants reply and say, that by any thing in the said respondents' answer to these complainants' libel, they ought not to be prevented from the recovery of their wages in their said libel demanded, because they say, that all and singular the matters and things by them in their libel aforesaid set forth are just and true, and this they are ready to verify. Wherefore they pray as before they have prayed.
                    "Jno. L. Leib,
          "Proctor for the Libellants."


Before PETERS, District Judge.

The district court ordered the payment of wages to the seamen until the return of the Hazard to Philadelphia, deducting the sums they had earned or received after they were taken from the Hazard and until their return to Philadelphia. From this decree the respondents appealed to the circuit court of the United States for the district of Pennsylvania, and the appeal was heard by the Honourable Judge WASHINGTON, at the April sessions, 1807. The decree of the district court was affirmed. [Case unreported.]

NOTE. By the result of the case of Singstrom et al. v. The Hazard, it must be perceived, that the allegations in the respondent's answer were not satisfactorily proved. One of the mariners (I think rather the carpenter) acknowledged the receipt of a sum of money, while he was a prisoner, for work in the way of his trade, which was credited to the owners of the Hazard. A conduct so unneutral and base as that of entering on board a privateer, would have met with the discouragement with which such misdemeanors of our seamen have always been treated. Few instances of this kind have ever appeared in proof. I have constantly denied wages, where the facts have, in any reasonable degree, been made out. In one or two cases it has appeared, that seamen of belligerents have been concealed in American ships, and opportunity afforded of escaping from their duty. I have deemed it incumbent on me to discountenance such illegal and improper acts, though they have not often occurred. In one case, I would not decree wages to such deserters; holding the contract, under such circumstances illegal; and not entitled to the aid of the court for its execution. If it were attended (as in the same case it was) with additional misconduct of unlawfully discharging the articled seamen, for the purpose of admitting the deserters at low wages, I have decreed wages for the voyage, to the seamen thus unlawfully discharged. No such practices, evidently reprehensible, ought to receive the support or countenance of a neutral court; whose duty it is, so far as it has power, to compel, by all the means it possesses, fair and impartial conduct in the citizens of a neutral country. Those who preserve a candid and irreproachable neutrality, have the stronger claims on belligerents for justice. It is no argument against doing right, that others do wrong. But it is an old maxim, both of law and reason, that he who seeks justice, should do it. It is often attempted to defeat the effect, and legal intent of the rule, that "mariners unlawfully discharged, or taken away by the vis major shall be paid full wages," by insisting, that mariners so discharged, or taken away, shall be bound to earn wages, and seek opportunities of so doing. This has never been considered as any legal objection to that rule. In the first instance, the payment of full wages is not only enjoined, by the maritime laws, as due by the contract, but it operates as a mulct, to punish the act of unlawful discharge; and to deter others from the like breaches of contract. It also proves the rule, that "equality is equity." The sailor forfeits by his desertion or malfeazance, and the master or merchant pays for his violations of the agreement. He who does the first wrong, is, on every principle, answerable for all consequences. In the latter case (seamen taken away) it is not often that those who are by force abstracted from their service, can obtain opportunities of profitably employing themselves. It is enough that they account for their earnings, if they obtain wages. If enquiries were permitted, to shew that they might have earned wages, controversies would be both perplexing, and endless. However severe it may seem, to those who seek for principles, only in individual gains or losses, the maritime laws view these subjects not only as they relate to contracts of individuals, but as they affect the general interests,

of commerce. and the policy of maritime states. If neutral seamen. particularly, when carried off by belligerents, did not look to a recovery of wages when liberated, it would be a great temptation to many of them to indemnify themselves by entering on board privateers, or other belligerent ships. This offence they should not be incited to commit, by a privation of what their contracts entitle them to, when their ceasing to serve is not occasioned by their own, but by the act of another. whose power they could not resist. Seamen thus compelled by necessity, and elicited by hopes of gain, would assist (as do all renegades) the more willingly, in depredations on their own countrymen. Deprived of motives to return home. or deterred by fear of punishment. they would remain in foreign service; and thus commerce would also suffer, by a diminution of the numbers required for its prosperity. The national defence, too. might be enfeebled by their absence. if naval operations were required; and it is for this, quite as much as for commercial advantages, that the policy of maritime states encourages and protects seamen. The laws of such states, and the policy of their governments, by every means and inducement. invite mariners. whose erratic life weakens or extinguishes local attachments, to return to their country. and remain in its service: in peace. for its commercial wealth and prosperity: in war and danger, for its surest defence and protection.